HARRIS TRUST & SAVINGS BANK, as Trustee of the Sperry Rand Master Retirement Trust No. 2 (and its successor, the Unisys Master Trust), Plaintiff,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE CO., Defendant.

No. 83 Civ. 5401(RPP).

United States District Court, S.D. New York.

Sept. 26, 1989.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Harris Trust and Savings Bank, trustee of the Sperry Rand Master Retirement Trust No. 2, has sued John Hancock Mutual Life Insurance Company, alleging breaches of contract, breaches of fiduciary duty, professional malpractice, unjust enrichment, and assorted violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). In these cross motions for partial summary judgment, the parties ask this Court to decide whether or not John Hancock is a fiduciary with respect to the Sperry Trust within the meaning of ERISA, and subject, therefore, to the responsibilities that attend that status.

In deciding the limited question presented by the parties' motions here, this Court considers only the Group Annuity Contract No. 50, as amended, and facts to which the parties have stipulated. For the reasons following the Court concludes that there are no genuine issues of material fact; and the Court finds as a matter of law that John Hancock is not an ERISA fiduciary with respect to the Sperry Trust. Accordingly, the defendant's motion for partial summary judgment is granted and the plaintiff's motion is denied. Fed.R.Civ.P. 56.

## BACKGROUND

The following is taken from the agreed statement of facts to which the parties have stipulated for the purposes of their motions.

As of March 1, 1941, the Sperry Corporation and the John Hancock Mutual Life Insurance Company entered into Group Annuity Contract No. 50 GAC ("GAC 50").[1] From its inception until December 31, 1967, GAC 50 was a deferred annuity contract, under which Sperry purchased deferred annuities from Hancock on an annual basis for each employee eligible under the terms of the Sperry Rand Master Retirement Trust No. 2 (the "plan" or the "Sperry Trust"), once that employee became entitled to benefits in accordance with the plan

Anderson Kill Olick and Oshinsky, P.C. by Lawrence A. Kill (Richard W. Collins, John B. Berringer and Ann V. Kramer, on the briefs), New York City, for plaintiff Harris Trust and Sav. Bank.

Reboul, MacMurray, Hewitt, Maynard and Kristol by Howard G. Kristol (Robert M. Peak, Richard J. Scarola and Karl J. Stoecker, on the briefs), New York City, for defendant John Hancock Mut. Life Ins. Co.

1. On November 12, 1986, the Sperry Corporation and the Burroughs Corporation merged to form the Unisys Corporation. The Sperry Rand

("the covered employees").[2] Upon the purchase of any deferred annuity, Hancock guaranteed the payment of that annuity to the covered employee (and his or her beneficiaries) for life to the extent that the employee and beneficiaries would be entitled to such a payment. In other words, once a covered employee's benefits vested pursuant to the terms of the plan, Hancock would guarantee the covered employee's benefits.

By an amendment effective as of January 1, 1968, GAC 50 was converted to a direct-rated retrospective immediate participation guarantee ("retro-IPG") form of contract. Hancock IPG contracts are "participating" contracts, sharing in the aggregate of the contract's mortality, expense, and investment experience to the extent that that experience is more favorable than the experience assumed in the contract's purchase rates.[3] Net investment income allocated to an IPG contract is directly credited on an annual basis to that contract's Pension Administration Fund ("PAF" or "IPG Fund"). The amount of the PAF depends in part on the investment performance of Hancock's general account and upon the allocation of that performance to GAC 50. Under the 1968 Amendment, Hancock guarantees that the PAF on any date will not be less than it otherwise

would have been if the sum of the net interest earned and capital gains and losses apportioned to the PAF had always been zero from January 1, 1968.

Pursuant to the 1968 Amendment to GAC 50, annuities purchased for certain employees up to December 31, 1967 were "cancelled," but Hancock continued to guarantee benefits to those employees and their beneficiaries. The 1968 Amendment also established a method for the provision of additional benefits payable for the period after December 31, 1967. Under the amendment, upon an eligible employee's retirement Hancock would determine, pursuant to rate tables contained in GAC 50, the amount by which the Liabilities of the Fund ("LOF")[4] would increase if that portion of the employee's retirement benefit accruing in the period after January 1, 1968 were to be guaranteed by Hancock.[5] If GAC 50's PAF balance exceeded the contract's Minimum Operating Level ("MOL") (equal to 105% of its LOF), based upon this increased LOF, Hancock would guarantee the payment of the additional benefits. If the amount of the PAF fell below the amount of the LOF (or if the amount of the PAF and its Supplemental Fund balances together fell below the

---

Master Retirement Trust No. 2 was then succeeded by the Unisys Master Trust.

2. The deferred annuities were to be payable to the employees (or their beneficiaries) upon the employees' retirement.

3. Since 1959, Hancock, with the approval of the New York State Insurance Department, has used the "investment generation" method for allocating investment income. The investment generation method tracks the net increase in the experience account of each contract for each year (the "cell") and credits each cell with the rate of return for general account assets acquired by Hancock in the original investment year, adjusted for "rollover," which includes the maturity, sale, call, and elimination through default of assets. Through its investment generation method, Hancock allocates income, capital gains or losses, expenses, and taxes to lines of business participating in the experience of Hancock's general account. The same method is used by Hancock for the purpose of allocations to IPG contracts.

4. GAC 50's LOF as of January 1, 1968 was based upon rate tables, incorporated into and made a

part of the contract, which contained two and a half percent and three percent interest rate assumptions and employed the 1937 Standard Annuity and 1951 Group Annuity Mortality Tables, with specified adjustments to reflect mortality improvement. Since as of 1968, Hancock has used and continues to use the interest rate assumptions incorporated in the 1968 Amendment's rate tables in its annual computation of the portion of GAC 50's LOF that pertains to the pre–1968 Annuities.

5. Hancock is required under GAC 50 to determine the LOF annually. In determining the LOF for GAC 50 Hancock each year has utilized the LOF rates incorporated into and made a part of the contract by the 1968 Amendment. As of January 1, 1968, the rates for the calculation of the portion of the LOF for retirement benefits guaranteed after December 31, 1967, incorporated a five percent interest factor and the 1951 Group Annuity Mortality Table, with specified adjustments to reflect mortality improvement.

amount of the MOL), Hancock could ask Sperry for a contribution.

The 1968 Amendment provided that if Sperry failed to maintain the PAF balance at least equal to the LOF (or to maintain GAC 50's PAF and Supplemental Fund balances at or above the MOL), the PAF could be "terminated." Upon termination of the PAF, the contract would cease to function as a retro-IPG contract, and would thereafter function as a deferred annuity contract. The termination of the PAF would also result in Hancock's "repurchase" of the pre–1968 Annuities and the purchase of annuities sufficient to provide the benefits guaranteed by Hancock in the period after January 1, 1968, at the rates set forth in the 1968 Amendment. As of January 1, 1968, GAC 50's PAF balance equalled its LOF. Since at least the early 1970s, GAC 50's PAF balance has exceeded the amount of its MOL (and thus its LOF). GAC 50 provides that if there is a balance in the PAF upon its termination, Hancock shall pay or apply that balance in a manner to be determined by mutual agreement between Hancock and the plan's trustee, Harris Trust.[6]

By an amendment effective as of August 1, 1977, GAC 50 was converted to a retrospective immediate participation guarantee/prospective deferred liability form of contract. Under the 1977 Amendment, GAC 50's LOF would not be increased automatically upon the retirement of any employee and new retirement benefits would not be guaranteed automatically by Hancock. On any date after August 1, 1977, the Sperry Retirement Committee ("SRC") could request that Hancock establish guaranteed benefits in addition to the benefits already guaranteed. Since the effective date of the 1977 Amendment, the SRC has not requested that Hancock establish any new guaranteed benefits.[7]

In November, 1988 Hancock transferred to Harris Trust, as trustee of the assets of the Sperry Rand Master Retirement Trust No. 2, approximately $53 million from out of the PAF.

## DISCUSSION

### I

The Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93–406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001 et seq.), is Congress's comprehensive and farreaching regulatory scheme to protect employee pensions. In Congress's own words, ERISA exists

> to protect ... the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

*Id.* § 1001(b); *See Massachusetts v. Morash*, —— U.S. ——, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989) (Congress passed ERISA "to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits"); *see also* 29 U.S.C. § 1001a(c); *id.* § 1001b(c). ERISA's scope is broad; it applies, with certain exceptions not germane, to "any employee benefit plan if it is established or maintained" by employers engaged in interstate commerce. *Id.* § 1003(a). Congress's commerce clause power, of course, is virtually limitless, and its exercise of that power in enacting ERISA was manifestly proper. *See, e.g., Hewlett–Packard Co. v. Barnes*, 425 F.Supp. 1294, 1300–01 (N.D.Cal.1977), *aff'd*, 571 F.2d 502 (9th Cir.) (per curiam), *cert.*

---

**6.** Harris Trust succeeded the Chase Manhattan Bank as trustee of the plan as of October 1, 1987.

**7.** The 1977 Amendment also provided for and permitted under certain circumstances the payment of "non-guaranteed benefits." The 1977 Amendment further provided that the monthly amount of non-guaranteed benefits for eligible employees designated by the SRC, as well as any determination of eligibility for such benefits, would be determined solely by the SRC in accordance with the plan. Pursuant to the 1977 Amendment, Hancock paid non-guaranteed benefits on a monthly basis through June 1982.

*denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). Neither Harris Trust nor John Hancock contends otherwise. Nor do the parties suggest that the Unisys Master Trust is anything but an "employee benefit plan," a term that ERISA explicitly defines. *See* 29 U.S.C. § 1002(3); *id.* § 1002(1); *id.* § 1002(2); *cf. Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).

■ John Hancock takes the position nonetheless that when it enacted ERISA Congress did not mean to "alter the way in which insurance companies invest and manage billions of dollars of assets and dislocate the ... framework of state regulation that has historically governed the industry practices that are the subject of [Harris Trust's] claims." Memorandum of Defendant in Support of its Motion for Partial Summary Judgment at 4. ERISA's broad preemption clause directs that the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The preemption clause is subject to the important qualification of the "saving clause," *id.* § 1144(b)(2)(A), which states that ERISA "shall [not] be construed to exempt or relieve any person from any law of any State which regulates insurance...." According to Hancock, the Supreme Court held in *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), that the saving clause incorporates the McCarran–Ferguson Act, 15 U.S.C. § 1011 et seq., which leaves the regulation of the business of insurance exclusively to the states. Hancock argues that with respect to GAC 50 it is engaged in the business of insurance; therefore, Hancock concludes, ERISA does not here apply. And Hancock does not shy away from the more general implication of its argument: that when an insurer is engaged in a particular practice that is part of the McCarran–Ferguson "business of insurance," the insurer is free of ERISA's strictures.

At first glance, Hancock's argument seems compelling. In interpreting ERISA's preemption clause, the Supreme Court has stressed that a state law "re-late[s] to any benefit plan" "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983); *see Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45–46, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987) ("the express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern'") (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2388–40, 85 L.Ed.2d 728 (1985). The saving clause then qualifies ERISA's preemptive effect. Discussing the saving clause in *Metropolitan Life,* the Supreme Court wrote:

That mandated-benefit laws fall within the terms of the definition of insurance in the McCarran–Ferguson Act is directly relevant in another sense as well. Congress' "primary concern" in enacting McCarran–Ferguson was to "ensure that the States would continue to have the ability to tax and regulate the business of insurance." That Act provides: "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." The ERISA saving clause, with its similarly worded protection of "any law of any State which regulates insurance," appears to have been designed to preserve the McCarran–Ferguson Act's reservation of the business of insurance to the States. The saving clause and the McCarran–Ferguson Act serve the same federal policy and utilize similar language to define what is left to the States. Moreover, § 514(d) of ERISA, 29 U.S.C. § 1144(d), explicitly states in part: "Nothing in [ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." Thus application of the McCarran–Ferguson Act lends further support to our ruling that Congress did not in-

tend mandated-benefit laws to be preempted by ERISA.

*Metropolitan Life,* 471 U.S. at 744 n. 21, 105 S.Ct. at 2391 n. 21 (citations omitted).

Read alone, the *Metropolitan Life* footnote does support Hancock's argument. Yet alone is how the footnote *must* be read to support Hancock's argument, for no case decided before or since, by the Supreme Court or any lower federal or state court, has gone as far. The footnote's context shows why not.

To begin with, footnote 21 is dictum. A close reading of *Metropolitan Life* demonstrates that the Supreme Court merely borrowed its McCarran–Ferguson analysis from prior cases to illuminate the similar statutory words of ERISA's saving clause. In *Metropolitan Life* the Court took a "common-sense view of the matter" and found that a Massachusetts law governing the content of general health plans was clearly one "which regulates insurance" within the meaning of the saving clause. 471 U.S. at 740, 105 S.Ct. at 2389. The Court then buttressed its conclusion by noting that state laws regulating the content of insurance contracts "relate to the regulation" of the "business of insurance" within the meaning of the McCarran–Ferguson Act, 15 U.S.C. § 1012(a), as well. *See* 471 U.S. at 742–44, 105 S.Ct. at 2390–92. In evaluating the McCarran–Ferguson "business of insurance," courts typically consider the factors delineated in *Union Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008–09, 73 L.Ed.2d 647 (1982),[8] and the Massachusetts statute met all three of the *Pireno* criteria. In short, the "traditional understanding of insurance regulation," embodied in McCarran–Fergu-

son and elucidated in *Pireno,* combined with the "plain language of the [ERISA] saving clause [and] its relationship to the other ERISA pre-emption provisions," together spared the Massachusetts law. *See Metropolitan Life,* 471 U.S. at 742–44, 105 S.Ct. at 2391–91. The petitioners in *Metropolitan Life* did not argue that ERISA did not apply at all, and, notwithstanding its footnote, the Court did not so hold.

■ Hancock argues that the practices of which Harris Trust complains constitute the "business of insurance," traditionally overseen and regulated by state insurance departments, and that under *Metropolitan Life* ERISA does not therefore apply. Taken to its logical extreme, Hancock's argument means that if ERISA does not preempt a state statute, the state statute, in effect, preempts ERISA. Yet ERISA's saving clause does not itself include Hancock's additional words, and the legislative history of the clause, which is sparse, does not fill in Hancock's putative statutory gap. *See Metropolitan Life,* 471 U.S. at 745 & nn. 22 & 23, 105 S.Ct. at 2392, nn. 22 & 23. This Court does not read *Metropolitan Life* or ERISA in that manner. ERISA need in no way alter traditional preemption analysis.[9] A court should. not look to insurance company business practices in inquiring into ERISA preemption but, as the Supreme Court did in *Metropolitan Life,* should instead look to state statutes and common law causes of action. This interpretation of the Supreme Court's approach in *Metropolitan Life* is confirmed by the Supreme Court's approach in *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), a

---

**8.** Those criteria are: *"First,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry." *Metropolitan Life,* 471 U.S. at 743, 105 S.Ct. at 2391 (quoting *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009 (emphasis in original)).

**9.** *See, e.g., Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted):

[S]tate law can be pre-empted in either of two general ways. If Congress evinces an intent to occupy a given field, any state law falling within that field is preempted. If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the *extent* it actually *conflicts* with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

**1004**

case that is *Metropolitan Life*'s complement. In *Metropolitan Life* the Court held that the Massachusetts mandated-benefits law was saved from ERISA preemption because it regulated insurance. In *Pilot Life* the Court held that Mississippi's common law tort and contract actions for improper claims processing did *not* regulate insurance, and *were*, therefore, preempted. The Supreme Court in *Metropolitan Life* and *Pilot Life*, and lower courts in other cases construing the saving clause, have used the language and case law of the McCarran–Ferguson Act to decide whether state laws ostensibly preempted, are, or are not, preserved. *E.g., Northern Group Servs Co. v. Auto Owners Ins. Co.*, 833 F.2d 85, 89–90 (6th Cir.1987). If a state statute meets the *Metropolitan Life* test, and thus fits ERISA's saving clause, the state law applies to the plan at issue. But ERISA applies to the plan as well.

*Metropolitan Life* is itself illustrative: because the Massachusetts law survived preemption, the decision "result[ed] in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not." *Metropolitan Life*, 471 U.S. at 747, 105 S.Ct. at 2393. While an uninsured plan would be subject solely to ERISA, an insured plan would be covered by both ERISA *and* the state law. *See id.; id.* at 748 n. 25, 105 S.Ct. at 2393 n. 25. This system of dual regulation comports with the language of the preemption and saving clauses, 29 U.S.C. § 1144, which save certain state statutes from preemption, but which also assume that ERISA applies ab initio. As the Seventh Circuit has written (in a case that predates *Metropolitan Life*),

> [t]hat ERISA does not relieve insurance companies of the onus of state regulation does not mean that Congress intended ERISA not to apply to insurance companies. Had that been Congress'[s] intent ... ERISA would have directly stated that it was preempted by state insurance laws. *Congress clearly intended that insurance companies be subject to dual regulation.*

*Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254, 260 (7th Cir.1983) (emphasis added). If the New York and Massachusetts state laws that govern Hancock's behavior relate to employee benefit plans and regulate the business of insurance, the laws would survive ERISA preemption.[10] The state statutes *and* ERISA would both apply to the insurer's activities.

This system of dual regulation thus harmonizes ERISA and McCarran–Ferguson, at least to the extent that state and federal law do not directly conflict.[11] In this case, the relevant state laws do not clash with any provisions of ERISA, with one seeming exception. Mass.Gen.L. ch. 175, § 66B permits an insurance company to invest its general account assets in home office properties. ERISA flatly prohibits that type of investment. *See* 29 U.S.C. § 1106. Nonetheless, the ERISA prohibition applies only to fiduciaries. Given this Court's conclusion that Hancock is not a fiduciary with respect to the Sperry plan, Hancock may

---

**10.** Among the statutes that Hancock cites are: N.Y. Ins. Law § 4224(a)(1) (prohibiting "unfair discrimination between individuals of the same class ... in the amount of payment or the return of premiums or rates charged for policies ... or in the dividends or other benefits"); N.Y. Ins. Law § 4226(a) (prohibiting unfair trade practices); N.Y. Ins. Law § 3201(b)(1) (requiring superintendent's approval of policy); Mass. Gen.L. ch. 175, § 93E (requiring insurers to keep surplus as reserves for obligation); Mass. Gen.L. ch. 175, §§ 63, 66B (regulating types of investments permissible for general accounts). Harris Trust concedes that each of the laws relates to employee benefit plans and that most of them probably regulate the business of insurance. *See* Plaintiff's Memorandum in Opposi-

tion to Defendant's Motion for Partial Summary Judgment app. A at 1–11.

**11.** At least one lower court has held that a state law is preempted notwithstanding its coverage by the saving clause, since Congress intended to make the subject of that law ERISA's exclusive concern. *Lee v. Prudential Ins. Co.*, 673 F.Supp. 998, 1000–02 (N.D.Cal.1987) (California statute providing private cause of action for unfair claims settlement practices meets McCarran Ferguson "business of insurance" test for ERISA saving clause purposes, but preempted nonetheless because Congress meant to make ERISA's civil enforcement provisions exclusive); *cf. Kanne v. Connecticut Gen. Life Ins. Co.*, 859 F.2d 96, 100 (9th Cir.1988).

invest its general account assets without violating ERISA's fiduciary requirements. *Cf. e.g., Fitzsimmons v. Old Security Life Ins. Co.,* Fed.Sec.L.Rep. (CCH) ¶ 96,236, 1977 WL 1057 (N.D.Ill.1977).

In further support of its argument that it is governed by state law, and exempt from ERISA, Hancock then turns to another section of ERISA itself, which provides that "[n]othing in [ERISA] shall be construed to alter, amend, modify, invalidate, or supersede any law of the United States...." 29 U.S.C. § 1144(d), *quoted in Metropolitan Life,* 471 U.S. at 744 n. 21, 105 S.Ct. at 2391 n. 21. The McCarran–Ferguson Act, of course, is a law of the United States. Congress drafted McCarran–Ferguson "broadly to give support to the existing and future state systems for regulating and taxing the business of insurance," *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429, 66 S.Ct. 1142, 1154–55, 90 L.Ed. 1342 (1946), *quoted in SEC v. National Sec., Inc.,* 393 U.S. 453, 458, 89 S.Ct. 564, 567–68, 21 L.Ed.2d 668 (1969); *see also State Bd. of Ins. v. Todd Shipyards Corp.,* 370 U.S. 451, 452, 82 S.Ct. 1380, 1381–82, 8 L.Ed.2d 620 (1962); *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 218 n. 18, 99 S.Ct. 1067, 1077 n. 18, 59 L.Ed.2d 261 (1979); to "turn back the clock" and reinvest states with the exclusive regulation of the business of insurance, *see, e.g., Idaho ex rel. Soward v. United States,* 858 F.2d 445, 449–50 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989). As Hancock shows, and as Harris Trust apparently concedes, the practices of which Harris Trust complains are clearly part of the "business of insurance" within the meaning of *Pireno. See* Memorandum of Defendant in Support of its Motion for Partial Summary Judgment at 25–33. The Sperry Trust would therefore come under McCarran–Ferguson. The trust just as clearly relates to an employee benefit plan, however, and it clearly comes under ERISA's purview as well. If ERISA and McCarran–Ferguson were really mutually exclusive, as Hancock contends, the two statutes would collide head on.

By its own terms, however, McCarran–Ferguson gives way. 15 U.S.C. § 1012(b) provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance...." ERISA fits the McCarran–Ferguson exception for laws that specifically relate to the business of insurance. *See Spirt v. Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir.1982) (ERISA is "a statute which clearly 'specifically relates to the business of insurance' "), *vacated on other grounds and remanded,* 463 U.S. 1223, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983); *Hewlett–Packard Co. v. Barnes,* 571 F.2d 502, 505 (9th Cir.) (per curiam) (there are "ERISA sections that undeniably 'specifically relate' to the business of insurance.... If McCarran–Ferguson applies, therefore, ERISA falls within the clause excepting federal laws that 'specifically relate' to the business of insurance."), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). Indeed, the "deemer" clause, 29 U.S.C. § 1144(b)(2)(B), uses the McCarran–Ferguson Act's very term of art: it provides that no employee benefit plan "shall be deemed to be an insurance company ... or to be engaged in the business of insurance ... for the purposes of any law of any State purporting to regulate insurance companies." The "guaranteed benefit policy" exception provides:

For purposes of this part:

. . . . .

(2) In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer. For purposes of this paragraph:

. . . . .

(B) The term "guaranteed benefit policy" means an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer....

29 U.S.C. § 1101(b); *see also Spirt, supra,* 691 F.2d at 1065 ("Congress, in enacting a statute primarily intended to deal with the conflict between state regulation of insurers and the federal antitrust laws, had no intention of declaring that subsequently enacted civil rights legislation would be inapplicable to any and all of the activities of an insurance company that can be classified as the 'business of insurance' "); *Women in City Gov't United, Inc. v. City of New York,* 515 F.Supp. 295, 302–06 (S.D.N.Y. 1981) (Title VII, "incorporated by reference into ERISA," applies to insurers, for "Congress'[s] concern that discrimination in employee benefits be prohibited outweighed the interest it had in the insurance industry and in the preservation of state insurance regulation").

Hancock is subject to dual regulation here for a further reason. As the Second Circuit has explained,

> [t]he McCarran[–Ferguson] Act does not ... exempt the business of insurance from the coverage of all federal statutes which do not specifically state that their provisions are applicable to insurance.... "[T]he McCarran–Ferguson Act was not intended to preclude the application of these federal statutes *unless* they invalidate, impair or supersede applicable State legislation regulating the business of insurance."

*Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.,* 408 F.2d 606, 611 (2d Cir. 1969) (quoting 291 F.Supp. 225, 230 (S.D.N.Y.1968)). As discussed above, ERISA does not necessarily "invalidate, impair, or supersede" any of the state laws to which Hancock is subject. *See Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419, 421 (4th Cir.1984) (Fair Housing Act would not adversely affect state laws regulating business of insurance); *Miller v. National Fidelity Life Ins. Co.,* 588 F.2d 185, 186–87 (5th Cir.1979) (same conclusion concerning

Federal Arbitration Act); *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.,* 408 F.2d 606, 611 (2d Cir.1969) (same). Because there is no conflict between them here, McCarran–Ferguson permits ERISA and state regulation of insurance to co-apply.

On more than one occasion the Supreme Court has remarked that ERISA's preemption and saving clauses "perhaps are not a model of legislative drafting." *Pilot Life, supra,* 481 U.S. at 46, 107 S.Ct. at 1552 (quoting *Metropolitan Life,* 471 U.S. at 739, 105 S.Ct. at 2389). In arguing that ERISA does not apply in this case at all, Hancock would add its own gloss to ERISA's words. Without more substantial language from Congress, however, or further guidance from the Supreme Court, this Court will not read in what Congress has not written. Accordingly, this Court holds that it must construe ERISA in resolving this motion.

## II

■ Having concluded that ERISA is applicable to this dispute, the Court must now consider whether to give collateral estoppel effect to a decision rendered in *Jacobson v. John Hancock Mutual Life Insurance Co.,* Civ. No. N–84–663 (PCD): Ruling on Motion for Summary Judgment, 655 F.Supp. 1290 (D.Conn.), *judgment withdrawn and vacated pursuant to settlement,* 662 F.Supp. 1103, 1112–13 (1987).

The plaintiffs in *Jacobson* were the trustees of a union pension fund who had entered into a contract called the Group Annuity Contract No. 738 ("GAC 738") with John Hancock, the *Jacobson* defendant. In its original incarnation GAC 738 was a deposit administration contract ("DAC").[12] On January 1, 1973, GAC 738 became an immediate participation guarantee contract. Judge Dorsey described the IPG contract as follows:

> tired, died, or became disabled, the amount of the premiums required to ensure the participant the benefits to which he was entitled under the plan was withdrawn and used to purchase an annuity." 662 F.Supp. at 1104 (citations omitted).

---

**12.** Under the DAC regime, payments to Hancock were held in an "unallocated fund during the active lives of the participants." Hancock "periodically credited [the account] with interest and additional dividends could be credited depending on the fruitfulness of [Hancock's] investment strategies." "When a plan beneficiary re-

"The IPG [was] the fund in which amounts [were] accumulated by [defendant] to be used for the payment of the benefits provided under [the] contract." Employers of plan beneficiaries paid to plaintiffs [certain] amounts.... Those funds were then paid by plaintiffs to defendant.... A separate reserve was established by defendant as part of the IPG (referred to as the Liability of the Fund ("LOF")), from which annuities were purchased to meet the pension entitlement of a participant. "The [LOF] on any date was the sum of the amounts required to enable [defendant] to fulfill its guarantees with respect to: (a) the benefits established under [the contract], and (b) any due and unpaid amounts chargeable to the [IPG]." The mathematical formula designed to make the LOF calculations were fixed in the contract. At no time could plaintiffs' contributions fall below the minimal amount necessary to operate the fund—equal to 110% of the LOF.

Defendant "assume[d] no liability as to the sufficiency of [IPG] to provide for the benefits under [the] contract other than those benefits for which amounts [were] included in the LOF." Defendant was liable, however, for the contributions made to and for pension benefits once a participant's entitlement was fixed.... When an entitlement was determined, defendant credited the LOF with an amount necessary to pay the benefit. Defendant then commenced periodic payments in accordance with the entitlement. Defendant guaranteed those payments. Plaintiffs were obligated to make additional contributions to cover any shortfall experienced by the LOF. In default of such contributions, defendant's obligation to pay benefits was reduced by a percentage determined by the LOF shortfall.

"Contributions payable [to IPG were] assigned to the General Investment Ac-count [ ("GIA") ]...." The contributions actually made [to the IPG] were pooled by defendant with its other contractholders' funds and invested.... The IPG differed from the DAC in that the latter established a partially fixed investment return and set the operating expenses at a fixed rate. The return on the investment in the IPG, however, depended entirely on the investment performance of defendant's GIA. Also, under the IPG, plaintiffs were charged with defendant's actual costs. The IPG accounts were adjusted annually to reflect the net investment experience minus expenses and taxes....

662 F.Supp. at 1104–05 (citations omitted).

In their complaint the *Jacobson* plaintiffs alleged that Hancock had violated the fiduciary requirements set out in 29 U.S.C. §§ 1104(a)(1), 1106(a)(1)(D), and 1106(b)(1)–(2). They then moved for partial summary judgment on the issue of Hancock's status as a fiduciary. In *Jacobson v. John Hancock Mutual Life Insurance Co.*, 655 F.Supp. 1290, *judgment withdrawn and vacated pursuant to settlement*, 662 F.Supp. 1103, 1112–13 (D.Conn.1987)), Judge Dorsey granted the plaintiffs' motion.

Judge Dorsey first decided that although the guaranteed benefit policy exception, 29 U.S.C. § 1101(b)(2)(B), "does indeed provide a safe harbor to insurance companies that sell standard annuity contracts to cover the anticipated needs of the relevant pension plan," that section "cover[s] only that phase of a contract in which the obligation of the insurer to guarantee the benefits payable to plan participants is fixed," and is therefore unavailing when "the level of funds available to support benefits which may become due fluctuates with the investment return of the insurer." 662 F.Supp. at 1107–08.[13] Judge Dorsey reviewed the legislative history of the guaranteed benefit policy exception and found that it "reflect[ed] a congressional intent to cloak the

---

**13.** Judge Dorsey reasoned that "unlike the guaranteed annuity contract, benefits of any or all participants are not guaranteed under GAC 738 so long as the fund contributions are subject to the investment results achieved by the insurer.

Poor investment results might reduce or even exhaust the funds below the level sufficient to pay benefits as they become fixed and payable. It is this contingency which § 1101(b)(2) addresses." 662 F.Supp. at 1108.

managers of both [general accounts and separate accounts] with fiduciary status." *Id.* at 1109.[14] He then considered Department of Labor Interpretive Bulletin 75–2, 29 C.F.R. § 2509.75–2 (1985), which supported Hancock's position. Judge Dorsey suggested that it was "an aberration in what ha[d] otherwise been a consistent [Labor Department] policy," and consequently, paid it no deference. *See id.* at 1109–11. Finally, Judge Dorsey examined Hancock's responsibilities under GAC 738 and decided that it "exercised significant control over the management of the plan." *Id.* at 1112. "Accordingly," he concluded, "[Hancock] is held to the standards of a fiduciary." *Id.*

According to Harris Trust, "the full spectrum of judicial concerns and public interests embodied in preclusion doctrine" demand that Judge Dorsey's decision preclude John Hancock from relitigating the issue raised in this motion. In other words, Harris Trust avers, Hancock should not be allowed to take "the proverbial 'second bite at the apple.'" Plaintiff's Reply Memorandum in Support of its Motion for Partial Summary Judgment at 68, 75.

The doctrine of issue preclusion holds that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5,

99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979)). As the Supreme Court has written, "[t]o preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* 440 U.S. at 153–54, 99 S.Ct. at 973–74; *see also Parklane Hosiery*, 439 U.S. at 326, 99 S.Ct. at 649 (issue preclusion, or "[c]ollateral estoppel, ... has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation") (citing *Blonder–Tongue Laboratories, Inc. v. University of Illinois Found.*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971)); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4416 (1981) [hereinafter Wright & Miller].

■ Judge Dorsey's entry of summary judgment against John Hancock in *Jacobson*, 655 F.Supp. 1290, could therefore warrant a similar order here. Federal trial courts enjoy "broad discretion" to decide when to apply issue preclusion offensively.[15] *Parklane Hosiery*, 439 U.S. at 331, 99 S.Ct. at 1444. Judge Dorsey's order meets all the criteria of *Parklane Hosiery*.[16] Hancock was an actual party to *Jacobson*, and Judge Dorsey gave it an opportunity to present its case. *See Hans-*

---

**14.** "This distinction [between general and separate accounts] ... is irrelevant in identifying plan assets for purposes of § 1101(b)(2), since that section only distinguishes between accounts which guarantee benefits or returns and accounts which do not make such guarantees. Thus, only accounts which guarantee fixed returns and fixed benefits are sheltered." 662 F.Supp. at 1109.

**15.** A case "involves offensive use of collateral estoppel" when, as here, "a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously lost in an earlier action." *Parklane Hosiery*, 439 U.S. at 329, 99 S.Ct. at 1443.

**16.** *Cf. GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1211 (S.D.N.Y.1981) (Pierce, J.): "Briefly stated, the following are preconditions

to the application of collateral estoppel: (1) the party against whom collateral estoppel is asserted must have been a party, or in privity with a party, to the prior action; (2) there must have been a final determination of the merits of the issues sought to be collaterally estopped; (3) the issues sought to be precluded must have been necessary, material, and essential to the prior outcome; (4) the issues sought to be precluded must have been actually litigated in the prior action, with the party against whom the estoppel is asserted having had a full and fair opportunity to litigate the issues; and (5) the issues actually and necessarily decided in the prior litigation must be identical to the issues sought to be estopped."

*berry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940). Judge Dorsey's ruling was "an adequate and firm determination of one issue in a given action [and Harris Trust] need not await the resolution of the remaining issues before obtaining preclusive effect in a subsequent action." *Morano v. Dillon*, 746 F.2d 942, 945 n. 4 (2d Cir.1984) (per curiam) (citing *Zdanok v. Glidden Co.*, 327 F.2d 944, 955 (2d Cir.) (Friendly, J.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964)); *see Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir.1961) (Friendly, J.) (" 'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again."), *cert. denied*, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962); *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1265 (2d Cir.1975), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976); *Kurlan v. Commissioner of Internal Revenue*, 343 F.2d 625, 628 n. 1 (2d Cir.1965); *cf.* Wright & Miller, *supra*, §§ 4432–4434; *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 66 (2d Cir.1986). In his opinion Judge Dorsey addressed the same issues raised by the motions here, and though the contract in *Jacobson* is not identical to the one in this action, the contractual features that differed in GAC 738 were probably "not of controlling significance." *Montana*, 440 U.S. at 160, 99 S.Ct. at 977.[17] Nor has Congress changed any "controlling legal principles" since. *Id.* at 161, 99 S.Ct. at 977–78. Finally, "none of the circumstances that might justify reluctance to allow the offensive use of collateral estoppel is present," *Parklane Hosiery*, 439 U.S. at 331, 99 S.Ct. at 652, Harris Trust could not

have joined in the *Jacobson* action; Hancock, well aware of the magnitude of the stakes in *Jacobson*, "had every incentive to litigate the ... lawsuit fully and vigorously," 439 U.S. at 332, 99 S.Ct. at 652; and Judge Dorsey's decision did not conflict with any other court's approach to the same issue—since no other court had yet faced it. In sum, under ordinary circumstances claim preclusion here would not be "unfair," *id.* at 331, 99 S.Ct. at 651–52, and the "contemporary law of collateral estoppel [should] lead[ ] inescapably to the conclusion that [Hancock] is collaterally estopped from relitigating the question" of whether it is an ERISA fiduciary, *id.* at 333, 99 S.Ct. at 652–53.

*Jacobson*, however, was not an ordinary case. Shortly after Judge Dorsey decided, on a motion for reconsideration, to adhere to his ruling on the motion for partial summary judgment, Hancock and the union trustees settled their dispute. The parties expressly conditioned settlement on "the entry of a final judgment by the Court pursuant to which (a) the order is withdrawn, set aside and vacated, and made of no further force or effect for use against defendant, ... by the Pension Fund, or by third parties, for collateral estoppel or other preclusive purposes," 662 F.Supp. at 1113, and Judge Dorsey, bound by the rule of *Nestle Co. v. Chester's Market, Inc.*, 756 F.2d 280 (2d Cir.1985), entered an order that embodied the parties' agreement. Harris Trust argues that Judge Dorsey's order, though withdrawn, should nonetheless preclude Hancock from relitigating what it has already lost. In support Harris Trust relies on *Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1187–92 (5th Cir.1982), *vacated on other grounds and remanded*, 460 U.S. 1007, 103 S.Ct.

---

**17.** Both GAC 50 and GAC 738 were retrospective IPG contracts converted from other types of group annuity contracts; both provided for the cancellation of the annuities purchased prior to conversion and the placing of the monies in funds held in Hancock's general investment account; and both contemplated payments to fund beneficiaries directly from that fund. *See generally* Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment at 66–69. It is true that GAC 738 did not contain a provi-

sion capping the risk charges at one percent, a provision germane to Hancock's argument that GAC 50 is an insurance contract, not an investment contract; and that GAC 738 was originally a deposit administration contract, not a deferred annuity contract, which seems to be a guaranteed benefit policy. Given the decision in *Nestle*, however, it is unnecessary to decide whether these distinctions would be important enough to preclude the application of collateral estoppel.

1245, 75 L.Ed.2d 476 (1983); *cf. Angstrohm Precision, Inc. v. Vishay Intertechnology, Inc.*, 567 F.Supp. 537, 540–41 (E.D.N.Y. 1982). One of the defendants in *Chemetron* had previously defended a securities fraud action arising out of the same stock manipulation scheme, and the trial judge in that prior action had filed a lengthy opinion detailing his findings of fact and awarding the plaintiff in the suit almost three quarters of a million dollars. Before the court actually entered judgment, the parties agreed to settle on the condition that the judge set aside his findings of fact. Later, in *Chemetron* itself, the plaintiff, which had not been a party to the prior action, asked the court to preclude the defendant common to both suits from relitigating the issues of fact that the judge in the prior action had withdrawn. After considering the factors mentioned in *Parklane Hosiery*, the Fifth Circuit held that offensive, nonmutual preclusion was fully warranted—the settlement notwithstanding:

> Tactically [the defendant] chose to litigate fully, ... risking an adverse decision. He lost on that risk, and only when he lost did he decide to settle, fearing offensive collateral estoppel. Yet now he seeks to avoid the consequences of that risk by elevating form over substance. He cannot have it both ways. The findings of fact against [the defendant] in [the prior action] are sufficiently final to permit their use in this case. On remand, [he] should be collaterally estopped from relitigating those facts.

682 F.2d at 1191–92.

As Harris Trust notes, *Chemetron*'s result makes some sense here: Judge Dorsey has already considered the issues raised by these motions, and forcing this Court to reconsider his thorough opinion would waste judicial resources. *Cf. Montana v. United States*, 440 U.S. at 153–54, 99 S.Ct. at 973–74. Harris Trust contends that the precise issue decided in *Chemetron* remains unanswered in the Second Circuit. It urges this Court to adopt the Fifth Circuit's approach. *Nestle Co. v. Chester's Market, Inc.*, 756 F.2d 280 (2d Cir.1985), however, suggests that for this Court, at least, the holding in *Chemetron* is foreclosed.

Shortly after Judge Blumenfeld ruled in *Nestle* in the defendant's favor on a motion for partial summary judgment, the parties negotiated a settlement conditioned on the vacatur of the opinion and judgment. Judge Blumenfeld then refused the parties' joint motion to vacate. *Nestle*, 596 F.Supp. 1445 (D.Conn.1984). On appeal, the Second Circuit reversed. Judge Winter began his opinion by finding that the dispute was not moot, and that vacatur was not required by the rule of *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950). Because of the settlement, however, vacatur would moot the action. "[W]e are faced," he wrote, "with a settlement that will bring pending litigation to an end. Because the policies favoring finality of judgments are intended to conserve judicial and private resources, the denial of the motion for vacatur is counterproductive because it will lead to more rather than less litigation." *Nestle*, 756 F.2d at 282. Judge Winter continued: "It is instructive to note that where the parties have not reached a settlement and where vacatur of a district court's judgment might deprive a party of protection it had fairly won, we have not directed vacatur." *Id.* at 283. In sum, in the Second Circuit, "the importance of honoring settlements" outweighs "the finality of final judgments." *Id.; see also Federal Data Corp. v. SMS Data Products Group*, 819 F.2d 277 (Fed.Cir.1987). *Contra Matter of Memorial Hospital of Iowa County*, 862 F.2d 1299 (7th Cir.1988); *Rinsgby Truck Lines, Inc. v. Western Conference of Teamsters*, 686 F.2d 720 (9th Cir.1982), *criticized in Nestle*, 756 F.2d at 283 n. 4.

Harris Trust argues that Judge Winter did not address the question presented here, and it quotes a sentence in which he wrote, "We are ... not faced with new litigation which seeks to avoid directly or indirectly an otherwise final judgment, such as ... a claim that a judgment previously entered in litigation between the parties over the same subject matter is not preclusive." *Id.* at 282; *see also* Note, "Avoiding Issue Preclusion by Settlement

Conditioned upon the Vacatur of Entered Judgments," 96 *Yale L.J.* 860, 862 (1986). Yet the sentence's context makes clear that Judge Winter was explaining why Judge Blumenfeld's denial of the motion to vacate would lead to more litigation—an otherwise unnecessary appeal—, and that Judge Winter referred to the preclusive effect of a valid, *unvacated* prior judgment as an example of when a district court might legitimately consider finality more important than settlement. Indeed, virtually every other sentence in Judge Winter's opinion suggests that litigants prepared to settle may contract with impunity over the preclusive effects of their dispute. A district judge in the Second Circuit must follow that lead. Judge Winter's views are well stated in a passage he quotes from a leading treatise:

> All of the policies that make voluntary settlement so important a means of concluding litigation apply. The appellee as well as the appellant may prefer settlement, and can bargain for whatever future protection it needs. *It cannot be argued that the possible nonmutual preclusion interests of nonparties justify either appellate decision against the wishes of the parties, or an insistence that as a price of settlement the appellant must permit the district court judgment to support nonmutual preclusion.* The parties should remain free to settle on terms that require vacation of the judgment, entry of a new consent judgment, or such other action as fits their needs.

Wright & Miller, *supra*, § 3533.10, at 432, *quoted at* 756 F.2d at 283 (emphasis added).[18]

In sum, the decision in *Jacobson v. John Hancock Mutual Life Insurance Co.*, 655 F.Supp. 1290 (D.Conn.), *judgment withdrawn and vacated pursuant to settlement*, 662 F.Supp. 1103, 1112–13 (1987), does not preclude John Hancock from relitigating the issues presented before Judge Dorsey. This opinion will now continue to consider the merits of the motions raised here.

### III

The final issue presented by these motions requires that this Court interpret the language of ERISA's fiduciary sections. Justice Marshall recently described the proper method of construing a statute:

> Ordinarily, we ascertain the meaning of a statutory provision by looking to its text, and, if the statutory language is unclear, to its legislative history. Where these barometers offer ambiguous guidance as to Congress' intent, we defer to the interpretation of the provision articulated by the agencies responsible for its enforcement, so long these agency interpretations are "based on a permissible construction of the statute."

*Public Employees Retirement Sys. v. Betts*, —— U.S. ——, 109 S.Ct. 2854, 2870, 106 L.Ed.2d 134 (1989) (Marshall, J., dissenting) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). Because the statutory provisions here have gone relatively unexamined, the more general words of Judge Learned Hand are particularly worthy of note:

> It is one of the surest indexes of a mature and developed jurisprudence not to

---

**18.** Judge Easterbrook spoke for the opposite view in *Matter of Memorial Hospital of Iowa County*, 862 F.2d at 1300, 1302:

> We always deny these motions [to vacate judgments after settlement] to the extent they ask us annul the district court's acts, on the ground that an opinion is a public act of the government, which may not be expunged by private agreement. History cannot be rewritten. There is no common law writ of erasure.... When a clash between genuine adversaries produces a precedent, ... the judicial system ought not allow the social value of

that precedent, created at cost to the public and other litigants, to be a bargaining chip in the process of settlement. The precedent, a public act of a public official, is not the parties' property.... To the extent an opinion permits the invocation of *Parklane [Hosiery]*, it may have great value to strangers—a value that one may try to approximate in settlement, but which is not theirs to sell. If parties want to avoid stare decisis and preclusive effects, they need only settle before the district judge renders a decision, an outcome our approach today encourages.

**1012**

make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945); *see also Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987) ("in expounding a statute, we [are] not ... guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy"), *quoted in Massachusetts v. Morash,* — U.S. —, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989).

The purpose and object of ERISA are set out in Congress's "findings and declaration of policy." Congress enacted ERISA *"to protect ... the interests of participants in employee benefit plans and their beneficiaries."* 29 U.S.C. § 1001(b). ERISA's legislative history is replete with comments that confirm that Congress intended to protect individual employees. The House Committee on Education and Labor, for example, wrote that "the primary purpose of [ERISA] is the protection of individual pension rights...., to improve the equitable character and soundness of private pension plans." H.R.Rep. No. 93–533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4639, 4655. As the House Ways and Means Committee explained,

One of the most important matters of public policy facing the nation today is how to assure that individuals who have spent their careers in useful and socially productive work will have adequate incomes to meet their needs when they retire. This legislation is concerned with improving the fairness and effectiveness of qualified retirement plans in their vital role of providing retirement income. In broad outline, the objective is to increase the number of individuals participating in

employer-financed plans; [and] to make sure to the greatest extent possible that those who do participate in such plans actually receive benefits....

H.R.Rep. No. 93–807, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 4670, 4676.

In furtherance of these purposes, ERISA makes certain persons [19] fiduciaries with respect to an employee benefit plan, and then holds them to fiduciary obligations. ERISA's fiduciary section provides that:

(1) ... [A] fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan....

29 U.S.C. § 1104(a); *see Berlin v. Michigan Bell Tel. Co.,* 858 F.2d 1154, 1162 (6th Cir.1988) (citing *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)); *see also* Joint Explanatory Statement of the Committee of Conference, H.R. Rep. No. 93–1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 5038, 5075–5106 [hereinafter *Conference Report*].

■ ERISA defines a fiduciary as follows:

**19.** "The term 'person' means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unin-

corporated organization, association, or employee organization." 29 U.S.C. § 1002(9).

[A] person is a fiduciary with respect to a plan to the extent ... he ... exercises any authority or control respecting management or disposition of its assets....

29 U.S.C. § 1002(21)(A)(i).[20] Whether Hancock is a fiduciary with respect to the Sperry Trust thus depends on the following questions: First, what are the "assets" of the plan? Second, to what extent does Hancock "exercise ... authority or control respecting [their] management or disposition"?

ERISA's general definitional section does not include the phrase "plan assets." At the same time, however, the fiduciary section itself provides for certain exceptions from its coverage. The exception relevant here provides as follows:

For purposes of this part:

.    .    .    .    .

(2) In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer. For purposes of this paragraph:

.    .    .    .    .

(B) The term "guaranteed benefit policy" means an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer....

29 U.S.C. § 1101(b)(2)(B).

Hancock argues that in GAC 50 the Sperry Trust has been issued a "guaranteed benefit policy," and that this asset of the plan is the contract embodying the policy, GAC 50, and the corpus of rights that the contract contains.[21] Harris Trust argues that GAC 50 is an investment contract, not an insurance contract; and that even if GAC 50 is an insurance contract, it does not "provide[ ] for benefits the amount of which is guaranteed." Therefore, Harris Trust concludes, GAC 50 is not a guaranteed benefit policy, and the plan's assets here must accordingly include the funds contained in the PAF.[22] For the following reasons, this Court agrees with Hancock that GAC 50 comes under the protection of the "guaranteed benefit policy" exception.

According to Harris Trust, GAC 50 is an investment contract, not an insurance contract. In support of its argument Harris

---

**20.** In its entirety, the fiduciary definition provides:

(A) Except as otherwise provided in subparagraph (B) [which deals with securities issued by companies registered under the Investment Company Act of 1940], a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). ERISA further requires that

Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.

29 U.S.C. § 1102(a)(1). The written instrument establishing the Sperry Trust names the Sperry Retirement Committee as fiduciary of the plan; the SRC's duties—management and administration of the trust—are now carried out by the Pension Investment Review Committee of Unisys Corporation. Harris Trust does not appear to argue that fiduciary status should attach to Hancock by virtue of any of the definitions set out in the first clause of subpart (i) or in subparts (ii) or (iii) of 29 U.S.C. § 1002(21)(A).

**21.** Hancock's position is set out for the most part in Goldberg & Altman, "The Case for the Nonapplication of ERISA to Insurers' General Account Assets," 21 *Tort & Ins. L.J.* 475 (1986). (The authors are members of the Fiduciary Task Force of the American Council of Life Insurance.)

**22.** Hancock argues that the funds associated with GAC 50 are not "assets" at all, but a "bookkeeping account." This distinction, which lacks support in precedent and which contradicts some of Hancock's own descriptions of the contract, may be more of metaphysical than of legal significance.

Trust cites *SEC v. United Benefit Life Insurance Co.*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), and *SEC v. Variable Annuity Life Insurance Co.*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (*"Valic"*). Neither case supports such a conclusion.[23]

In *Valic*, the Supreme Court faced the question of whether a variable annuity was a "insurance contract" within the meaning of the McCarran–Ferguson Act and the federal securities acts. The Court decided that it was a "security." Justice Douglas first noted that "the meaning of 'insurance' or 'annuity' under these Federal Acts is a federal question," not a question of state law. 359 U.S. at 69, 79 S.Ct. at 620–21. He then explained how variable annuities differ from fixed ones.

> First, premiums collected are invested to a greater degree in common stocks and other equities. Second, benefit payments vary with the success of the investment policy.... The holder of a variable annuity cannot look forward to fixed monthly or yearly amount in his advancing years. It may be greater or less, depending on the wisdom of the investment policy....
>
> The difficulty is that, absent some guarantee of fixed income, the variable annuity places all the investment risks on the annuitant, none on the company. The holder gets only a *pro rata* share of what the portfolio of equity interests reflects—which may be a lot, a little, or nothing.... [W]e conclude that the concept of "insurance" involves some investment risk-taking on the part of the company.... For in common understanding "insurance" involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts.

*Id.* at 69–71, 79 S.Ct. at 621–22 (footnotes and citations omitted).

The Court's analysis in *United Benefit* was similar. As Justice Harlan described the contract at issue, the purchaser of the annuity paid premiums into a separate account, and the insurance company invested the funds for the most part in common stocks. During the contract's "accumulation" phase, "[i]nstead of promising to the policyholder an accumulation to a fixed amount of savings at interest, the insurer promises to serve as an investment agency and allow the policyholder to share in its investment experience. The insurer is obligated to produce no more than the guaranteed minimum at maturity, and this amount is substantially less than that guaranteed by the same premiums in a conventional deferred annuity contract." 387 U.S. at 208, 87 S.Ct. at 1560. Before the contract's maturity, the purchaser was "entitled to his proportionate share of the total fund and may withdraw all or part of this interest ... [and] is also entitled to an alternative cash value measured by a percentage of his net premiums which gradually increases.... At maturity, the purchaser may elect to receive the cash value of his policy, measured either by his interest in the fund or by the net premium guarantee, whichever is larger." *Id.* at 205, 87 S.Ct. at 1559. Like a variable annuity, therefore, the deferred, or optional, annuity in *United Benefit* "allow[ed] the purchaser to reap the benefits of a professional investment program." *Id.* at 204, 87 S.Ct. at 1558. The fund did not fall within the insurance exemption to the securities laws because it was "considered to appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of 'growth' through sound investment management." *Id.* at 211, 87 S.Ct. at 1562; *see also Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.*, 698 F.2d 320, 324–25, 326–27 (7th Cir. 1983); *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1130–34 (7th Cir.1986); *cf. Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1064 (2d Cir.1982).

As the agreed statement of facts reveals, GAC 50 is a retrospective immediate partic-

---

**23.** Actually, both *Valic* and *United Benefit* predated ERISA, and both addressed the scope of the insurance exception to the federal securities laws, not the guaranteed benefit exception to ERISA. *Cf. United Benefit*, 387 U.S. at 212, 87 S.Ct. at 1562–63. Thus, neither case is directly on point.

ipation guarantee contract. An IPG contract works as follows:

> [IPG] contracts are similar to deposit administration contracts in that the employer's contributions are placed in an unallocated fund and the life insurance company guarantees that the annuities for retired employees will be paid in full. They differ from deposit administration contracts in the extent to which, and the time at which, the insurance company assumes mortality, investment, and expense risks with respect to retired lives. The IPG contract may be said to have two stages of existence. The first or active stage continues for as long as the employer makes contributions sufficient to keep the amount in the fund above the amount required to meet the life insurance company's price to provide guaranteed annuities for employees who have retired. The contract enters its second stage if the amount in the fund falls to the so-called critical level.
>
> In the active stage, the contract fund is charged directly with the contract's share of the life insurance company's expense[s] and credited directly with its share of investment income (minus a small risk charge). The fund is also credited or charged directly with contract's share of the company's capital gains and losses and the investment and expense experience with respect to retired employees. If the employer allows the fund to fall to the critical level and the contract enters the second stage, the amount in the fund is used to establish fully guaranteed annuities, and the fund itself ceases to exist.
>
> Under an IPG contract, as long as the employer's contributions are sufficient to maintain the contract in active status, the life insurance company is relieved of investment, mortality, and expense risks with respect to all employees, both active and retired. If and when the contract enters the second stage, all these risks will be assumed by the insurance company. *Of course, the company is under a substantial risk during the active status of the contract, since it has provided a guaranteed price structure that the employer can unilaterally decide to take advantage of at any time that it feels the probable future course of investment, mortality, and expense risks will be such that it will be to its advantage to shift the risk to the life insurance company.*

K. Black & H. Skipper, *Life Insurance* 496–97 (11th ed.1987) (emphasis added).[24] A retrospective IPG contract differs from a newly issued IPG contract in that it assumes responsibility for the guarantees already existing under the previous contractual regime.

Thus, unlike the contracts that governed the plans at issue in *Valic* and *United Benefit*, GAC 50 places the insurance risks on the insurer, not on the plan's covered employees. Nor does GAC 50 have an "accumulation" phase in which the amount available to the *beneficiary*, as opposed to the contractholder, might fluctuate, as it did in *United Benefit*.[25] Whatever the in-

---

**24.** Professors Black and Skipper note further that "[r]ecently, some IPG contracts have been modified, eliminating the guaranteed annuity rates; rather, they provide a certificate stating that the nonguaranteed payments will be made until the fund is exhausted. Under this arrangement the employer is responsible for the adequacy of the funding, and employees have no assurance from the life insurance company that their benefit payments will continue until death." *Id.* at 497.

**25.** In *Peoria,* the Seventh Circuit found that the deposit administration contract at issue was an insurance contract during its annuity phase, but an investment contract during its accumulation phase, even though, "unlike [in] *United Benefit,* the annuitant himself—the employee—does not bear, at least directly, the investment risk created by the contract. His benefits are fixed; that is the essence of a defined benefits plan." 698 F.2d at 325. This extension of *United Benefit* ignores the fact that Congress expressly enacted ERISA to protect *employees,* not employers. *See* 29 U.S.C. § 1001(b); *Massachusetts v. Morash,* —— U.S. ——, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989). *Peoria's* holding as to the contract's exemption from the securities laws should not require the same result as to ERISA. If the *covered employee's* retirement benefits are determined by years of service and salary, etc., and are not subject to variation based on investment performance during the accumulation phase, the investment effects on the employer do not make the contract any less an insurance contract as to the covered employee within the

vestment experience of Hancock's general account, as credited to the PAF, the covered employees receive a fixed amount determinable by reference to the terms of the plan and not by investment performance. *See* A.S.F. ¶¶ 10, 32, 42; GAC 50 art. II, § 2(F); *id.* art. V, § 1. This amount provided to the covered employees remains fixed even if the PAF falls below the minimum operating level and the contract reverts to a deferred annuity type. In other words, if Hancock's general account experiences negative investment results, it must still pay the covered employees the amounts to which they are entitled.

Harris Trust argues that Hancock's "risk" is illusory, since the LOF purchase rates for the contract contain interest assumptions of two and a half and three percent, which Harris Trust calls "outmoded," thus maintaining the PAF at a higher level than it would be if the interest rates were revalued. Furthermore, Harris Trust argues that the possibility of a reversion of the contract is remote. As Harris Trust reads *Valic* and *United Benefit,* the Supreme Court was concerned with the amount of risk that the insurer assumed; since, according to Harris Trust, Hancock bears little risk at all, GAC 50 cannot be a contract of insurance. That argument, however, misconstrues the two cases: they were concerned with the *transfer* of risk from insured to insurer, not simply the nature of the risk the insurer might bear. Harris Trust's argument also minimizes certain of the substantial risks that Hancock does bear, and ignores certain others.

Hancock bears risks under GAC 50 in the following ways, among others:

· It guarantees benefit payments to pre–1968 covered employees and their beneficiaries in fixed amounts, regardless of any increases in life expectancy tables and regardless of the investment experience of Hancock's general account and its corresponding credit to the PAF. A.S.F. ¶¶ 10, 32, 42; GAC 50 art. II, § 2(F); *id.* art. V, § 1.

· It guarantees that post–1968 eligible employees will receive fixed payments on retirement, so long as the PAF is at least equal to the LOF at the time they become vested. A.S.F. ¶ 39.

· It guarantees that on any date the PAF will not fall below the amount that it would have been if the sum of the net interest earned and capital gains and losses apportioned to it had always been zero from the date of its conversion in 1968. A.S.F. ¶ 27; *see* GAC 50 art. III, § 3.

· It guarantees that the "risk charges" applicable to GAC 50 are capped at one percent. A.S.F. ¶¶ 43, 114.

Each of those facts obliges Hancock to bear risks.[26] For example, if Hancock's general account suffered adverse investment results, the PAF would fall below the level of the LOF. Hancock could request additional contributions from Harris Trust, but Harris Trust would be free to decline. GAC 50 would then revert to deferred annuity form, and Hancock would be obliged to provide annuities to all covered employees in consideration of the benefits guaran-

meaning of the guaranteed benefit policy exception. *Cf.* 698 F.2d at 328 (noting that on application for rehearing, newly hired counsel for the appellee offered "a number of arguments and authorities that ... original counsel had not drawn to the attention of the court, [and that] [i]n view of the fact that the panel decision merely reverses the dismissal of the complaint under Fed.R.Civ.P. 12(b)(6), the case is at an early stage and the appellee will have ample opportunity to present its [new] arguments ... consistently with the flexible contours of the doctrine of the law of the case").

**26.** *See generally* K. Black & H. Skipper, *supra,* at 494:

Life insurance companies are in the business of accepting risks, so they are willing to un-

derwrite several different risks associated with pension plans and to underwrite them to varying degrees, depending on the employer's wishes. Some of these are as follows:

1. More individuals may live to retire than the mortality tables used anticipated.

2. Those who retire may live longer than the mortality tables used anticipated.

3. The rate of interest earned on investments may fall below the anticipated level.

4. There may be defaults in the investment portfolio, or it may necessary to sell particular investments at a loss.

5. Expenses of handling the plan may be higher than anticipated.

teed to those employees up to that time. Hancock would lose a sum of money equal to the amount by which the annuity payments to covered employees exceeded the premiums it had received plus the investment gains attributed to those premiums. Furthermore, the covered employees and their beneficiaries might outlive their assumed life expectancies, and under its guarantee Hancock would have to pay benefits for longer than it had calculated. Neither scenario was manifestly implausible in 1968. Hancock also guarantees that the rate tables under the contract will be applicable to both newly eligible employees or additional groups of employees, should Harris Trust so desire. Although interest rates have increased since 1968, they have been known to revert to their previous levels or lower, and, in that event, Hancock would still be obliged to guarantee those additional benefits. Given the possibility of a stock market crash, moreover, Hancock's guarantee of the principal of the PAF also constitutes the assumption of risk. These risks are not illusory, and were not illusory in 1968, when GAC 50 was amended. Indeed, Hancock's transfer in November, 1988 of approximately $53 million from the PAF to Harris Trust reduced the PAF to a level at which the contract's reversion to deferred annuity form may be triggered more readily. In sum, Harris Trust seems to be arguing that in hindsight, it does not like the bargain that it once struck. That argument should not change the terms of its contract, provided the covered employees are not prejudiced.

 As noted above, ERISA defines a "guaranteed benefit policy" as "an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer." 29 U.S.C. § 1101(b). The above interpretation of the statutory provision's language is supported by its legislative history. The conference committee report explained:

> An insurance company also is not considered to hold plan assets if a plan purchases an insurance policy from it, to the extent that the policy provides payments guaranteed by the company. If the policy guarantees basic payments but other payments may vary with, *e.g.,* investment performance, then the variable part of the policy and the assets attributable thereto are not to be considered as guaranteed, and are to be considered as plan assets subject to the fiduciary rules.

*Conference Report, supra,* at 5077. This commentary (which is the sole passage in the legislative history that deals with the guaranteed benefit policy exception) confirms that while Congress did intend ERISA's fiduciary sections to cover variable annuity contracts, Congress did not intend to hold an insurer to a fiduciary standard if the contract it issues provides for fixed payments to the plan beneficiary.

Harris Trust interprets the conference report differently. It argues that the guaranteed benefit policy exception does not cover policies in which payments to the *contractholder* might fluctuate, and that since the funds in the PAF cannot be divided into those that support payments that are guaranteed and others that not guaranteed, the entire PAF must not be covered by the exemption at all.[27] Yet Harris Trust's argument rests on a misinterpretation of the word "benefit" in the statute and of the word "payment" in the conference report. ERISA was enacted to protect the interests of pension plan participants, that is, of employees, and not the fiscal wellbeing of their employers.[28] Each

**27.** As a fallback position, Harris Trust argues the opposite—that Hancock should be deemed a fiduciary with respect to the sum of money in the PAF that exceeds the sum of the MOL (an amount Harris Trust refers to as "free money"). As Hancock notes, however, Harris Trust does not explain how such a bifurcation might work in practice. More significantly, given the Court's holding that a plan's "assets" do not include those funds held in an insurer's general

account, the difference between the PAF and MOL is of no legal bearing. *See also American Inst. of Architects Benefit Ins. Trust v. John Hancock Mut. Life Ins. Co.,* No. CV 86–08436 (C.D. Cal. Sept. 14, 1987), *aff'd mem.,* 857 F.2d 1477 (9th Cir.1988).

**28.** This Court is aware of employers terminating plans that are overfunded to provide funds for leveraged buyout obligations or other corporate

time ERISA uses the word "benefit," it refers to the payments made to the employees themselves. *See, e.g.,* 29 U.S.C. § 1002(7) (" 'participant' means any employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan"); *id.* § 1002(8) (" 'beneficiary' means a person designated by a participant ... who is or may become entitled to a benefit"); *id.* §§ 1023(e), 1054, 1056, 1104(a)(1)(A)(i), 1108(c)(1). The word "benefit" in the guaranteed benefit policy exception, and the word "payment" in the conference report, are no different; they too refer to benefits and payments to covered employees. Because GAC 50 provides for fixed payments to covered employees, it is covered by the guaranteed benefit policy exception.

Pronouncements by the Department of Labor, the administrative agency charged with ERISA's enforcement, *see* 29 U.S.C. § 1135, support the same conclusion. ERISA Interpretive Bulletin 75–2 provides as follows:

> (b) *Contracts or policies of insurance.* If an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets in such account shall not be considered to be plan assets. Therefore, a subsequent transaction involving the general asset account between a party in interest and the insurance company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction.

29 C.F.R. § 2509.75–2 (1988). In hearings before a subcommittee of the House of Representatives, Assistant Secretary of Labor for Labor Management Relations Paul J. Fasser explained:

> Let's take a large multiemployer plan, having several thousand contributing employers, the benefits of which are wholly insured but not fully guaranteed. The insurance company invests the premiums it receives from the plan along with premiums received from other policyholders, in a wide variety of ways: corporate and government bonds, real estate mortgages, other secured loans, and some equities, to mention a few. Section 401(b) [29 U.S.C. § 1101(b) ] could be read to mean that the insurance company could not invest its premium receipts in bonds or equity securities issued by any of the employers contributing to the policyholder plan, [that] it could not allow any of these employers to lease space in a building on which it held a mortgage, and [that] it could not purchase goods, services, or facilities from any one of those employers.
>
> ... We studied the law and the underlying rationale of the prohibited transactions provisions, we studied the legislative history, we conferred with our colleagues at the Internal Revenue Service, we applied our collective common sense, and we concluded that Congress did not intend this result. We recognized that the prohibited transactions restrictions are designed to avoid conflicts of interest situations, but we knew that where the premiums paid by a plan are placed in an insurance company's general asset account, along with the assets of many other plans, the risk of any one plan being able to influence the investment policy of the insurance company respecting the general asset account is extremely slight.
>
> So we exercised our authority to interpret the law and we published an interpretive bulletin ... stating that the mere investment of plan assets by a plan in a corporate entity or partnership does not convert the assets of the corporation or partnership into plan assets and does not make the managers of the corporation or partnership fiduciaries to the plan. Those managers are thus not restricted from engaging in normal business transactions, including transactions with persons who happen to be parties in interest with respect to the policyholder plans.

purposes. (In some such cases, employees' pension benefits may remain secure but their employment status is sometimes affected.)

*Oversight on ERISA: Hearings on Public Law No. 93–406 Before the Subcommittee on Labor Standards of the House Committee on Education and Labor,* 94th Cong., 1st Sess. 390–91 (1975), *quoted in Jacobson, supra,* 662 F.Supp. at 1109–10 (and *reprinted in* Goldberg & Altman, "The Case for the Nonapplication of ERISA to Insurers' General Account Assets," 21 *Tort & Ins. L.J.* 475, 485–86 (1986)). This logic applies with equal force to single employer plans.

Harris Trust argues that other, later Department of Labor commentary contradicts Interpretive Bulletin 75–2. Harris Trust relies on Department of Labor Advisory Opinion 83–51A (Sept. 21, 1983) and on Department of Labor Advisory Opinion 78–8A (Mar. 13, 1978). Advisory Opinion 83–51A does seem to support Harris Trust's position. It includes the following comment:

> In the Department's view, a separate account would not hold "plan assets" for the purposes of the fiduciary responsibility provisions of ERISA if it is maintained by an insurance company solely in connection with its fixed contractual obligations and if neither the amount payable (or credited to) the plan or to any participant or beneficiary of the plan (including an annuitant) is affected in any way by the investment performance of the separate account. Since it appears that the contracts described in your letter provide for fixed obligations of the insurance company and that the investment performance of the separate accounts do not, in any circumstances, affect the insurance company's obligations to either the plan to which the contract is issued or to its participants and beneficiaries, such separate accounts would therefore not be considered to hold "plan assets."

Advisory Opinion 83–51A, at 2. As advisory opinions, however, the letters "apply only to the situation described therein. Only the parties described in the request for opinion may rely on the opinion, and they may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and their situation conforms to the situation described in the request for opinion." ERISA Procedure 76–1, § 10, 41 Fed.Reg. 36,281 (Aug. 27, 1976); *see* Advisory Opinion 83–51A, at 2 ("This letter constitutes an advisory opinion under ERISA Procedure 76–1.... Accordingly, it is issued subject to the provisions of the procedure, including section 10 thereof relating to the effect of advisory opinions."). Furthermore, both opinion letters address a question relating to funds held in *separate,* not general, accounts. *See* Advisory Opinion 78–8A, at 2 ("Although CREF labels its account a 'general' account, it is the view of the Department of Labor ... that the assets in the account which support obligations under variable annuity contracts issued to pension plans are plan assets.... The annuity contracts issued by CREF provide for variable benefits; generally assets supporting obligations under these contracts are held in a separate account."). The opinion letters are therefore of no precedential significance. Instead, the Department of Labor has later confirmed the interpretation it set out in Interpretive Bulletin 75–2. *See Proposed Final Regulation Relating to the Definition of Plan Assets,* 51 Fed.Reg. 41,262 (Nov. 13, 1986); 50 Fed.Reg. 961 (Jan. 8, 1985). Because the Department of Labor's interpretation of the guaranteed benefit policy exception is manifestly "permissible," this Court "may not substitute its own construction." *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). Accordingly, this Court holds that the assets held in Hancock's general account are not "plan assets" within the meaning of ERISA's fiduciary sections.

As the guaranteed benefit policy exception itself provides, because GAC 50 is a guaranteed benefit policy, the assets of the plan "shall be deemed to include such policy"—that is, GAC 50 and the bundle of contractual rights that flow from it. With respect to the policy, only the contractholder, not the insurer, is to be held to fiduciary standards. This conclusion finds support in ERISA's legislative history. Referring to the insurance contract exception to the requirement that "all plan assets are to be

held in trust," 29 U.S.C. § 1103(b)(1), the Committee on Conference stated:

> A trust is not to be required in the case of plan assets which consist of insurance (including annuity) contracts or policies issued by an insurance company qualified to do business in a State (or the District of Columbia).... Although these contracts need not be held in trust, nevertheless, the person who holds the contract is to be a fiduciary and is to act in accordance with the fiduciary rules ... with respect to these contracts. For example, this person is to prudently take and keep exclusive control of the contracts, and is to use prudent care and skill to preserve this property.

*Conference Report, supra,* at 5079. A contrary interpretation would lead to absurd results. As Harris Trust notes, for example, GAC 50 gives Hancock the authority to "ascertain and apportion any divisible surplus accruing under contracts of this class," GAC 50 art. V, § 7; *see* A.S.F. ¶ 28. Yet Hancock sets dividend rates for *all* its participating group annuity contracts, pursuant to the requirements of state law. It would impossible for Hancock to comply with ERISA's requirement that it act "solely in the interest" of the participants and beneficiaries of the Sperry Trust without simultaneously breaching its duties to all its other customers. Congress could not have intended such an outcome.[29]

### CONCLUSION

In conclusion, this Court holds that John Hancock is not a fiduciary with respect to the Sperry Rand Master Retirement Trust No. 2. Accordingly, the defendant's motion for partial summary judgment is granted, and the plaintiff's motion for partial summary judgment is denied. The first count of the plaintiff's amended complaint is hereby dismissed.

IT IS SO ORDERED.

---

29. Harris Trust argues that the asset of the plan is the policy itself, that Hancock "exercises authority or control respecting management or disposition" of the policy, 29 U.S.C. § 1002(21)(A)(i), and that with respect to the policy Hancock must therefore abide by the fiduciary requirements. Harris Trust bases its argument on two cases, *Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.,* 713 F.2d 254 (7th Cir.1983), and *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.,*

805 F.2d 732 (7th Cir.1986); *see also F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir.1987). As Hancock points out, however, both *Chicago Board* and *Ed Miniat* involved contracts that gave the insurer the unilateral right to amend terms to the detriment of the trustee. *See* Memorandum of Defendant in Opposition to Plaintiff's Motion for Partial Summary Judgment at 74–79. GAC 50 does not confer any similar discretion.