**HARRIS TRUST AND SAVINGS BANK, as Trustee for the Sperry Master Retirement Trust # 2, Plaintiff–Appellant,**

v.

**JOHN HANCOCK MUTUAL LIFE INSURANCE CO., Defendant–Appellee.**

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Third–Party Plaintiff,**

v.

**CHASE MANHATTAN BANK, N.A., Counterclaim–Defendant,**

and

**Sperry Corporation and The Retirement Committee of Sperry Corporation, Third–Party Defendants.**

**No. 979, Docket 91–7854.**

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1992.

Decided July 30, 1992.

Lawrence Kill, New York City (John B. Berringer, Ann V. Kramer, Anderson Kill Olick & Oshinsky, P.C., of counsel), for plaintiff-appellant.

Howard G. Kristol, New York City (Robert M. Peak, Richard J.J. Scarola, Reboul, MacMurray, Hewitt, Maynard & Kristol, of counsel), for defendant-appellee.

Richard E. Barnsback, Stephen W. Kraus, Phillip E. Stano, The American Council of Life Insurance, Washington, D.C., James F. Jorden, Stephen H. Goldberg, Waldemar J. Pflepsen, Jr., Perry Ian Cone, Jorden Schulte & Burchette, Washington, D.C., submitted a brief for Amicus Curiae The American Council of Life Ins.

Before: FEINBERG, TIMBERS and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiff-appellant Harris Trust and Savings Bank as Trustee for the Sperry Master Retirement Trust No. 2 and its successor, the Unisys Master Trust ("Harris Trust"), appeals from a final judgment entered on August 16, 1991 in the United States District Court for the Southern District of New York (Patterson, *J.*) in favor of defendant-appellee John Hancock Mutual Life Insurance Company ("Hancock"). The final judgment dismissed in its entirety the amended complaint in this action in accordance with two opinion-orders, the first granting partial summary judgment dismissing Harris Trust's claim for breach of fiduciary duties under the Employee Retirement Income Security Act of 1947 ("ERISA"), 29 U.S.C. § 1001 *et seq.,* and the second granting summary judgment dismissing Harris Trust's contract and common law claims. *See Harris Trust & Savings Bank, as Trustee of the Sperry Master Retirement Trust No. 2 v. John Hancock Mutual Life Ins. Co.,* 722 F.Supp. 998 (S.D.N.Y.1989) (*"Harris I"*) and *Harris Trust & Savings Bank, as Trustee of the Sperry Master Retirement Trust No. 2 v. John Hancock Mutual Life Ins. Co.,* 767 F.Supp. 1269 (S.D.N.Y.1991) (*"Harris II"*).

The dispute between the parties centers upon a certain contract known as Group Annuity Contract No. 50 ("GAC 50"), originally entered into in 1941 between Hancock and Sperry Rand Corporation to fund a retirement plan for the benefit of Sperry employees. Sperry has undergone a number of changes in name and corporate form since the execution of GAC 50 but will be referred to herein by its original name. Harris Trust is the present trustee of the retirement plan and the ultimate successor to Sperry's right as contractholder of GAC 50. In *Harris I,* the district court decided that Hancock was exempt from the fiduciary responsibility provisions of ERISA in connection with the management of GAC 50 for the reason that GAC 50 is a "guaranteed benefit policy." In *Harris II,* the district court decided that there was no basis for any of the contractual and other common law claims pleaded by Harris Trust against Hancock. The sole challenge to *Harris II* raised by Harris Trust on this appeal relates to the district court's rejection of the claim that Hancock breached GAC 50 by terminating the payment of non-guaranteed pension benefits. As to the ERISA fiduciary claims disposed of in *Harris I,* Harris Trust argues here, as it did in the district court, that Hancock is an ERISA fiduciary with respect to the assets it holds under GAC 50; that Hancock is an ERISA fiduciary in respect of the contract itself; and that Hancock is in any event collaterally estopped from re-litigating the fiduciary status issue as the consequence of an order in another case, subsequently vacated, deciding the very question presented here.

To assist us in resolving the issue of fiduciary responsibility, we solicited an *amicus* brief from the United States Department of Labor, the government agency charged with the enforcement of ERISA. The Department apparently has issued an Interpretive Bulletin, as well as two Advisory Opinions, bearing on the issue. The Bulletin is not entirely clear and appears to be in conflict with the Opinions. Following oral argument, the Clerk of the Court, at our direction, invited the submission of an *amicus* brief within thirty days of receipt of her letter dated February 12, 1992. By motion dated March 3, 1992, the Department of Labor sought an extension to May 12, 1992, asserting that the additional time (approximately three months) was needed because (1) the Secretary had not formulated a final position on the issue; (2) the case was important and complex; (3) more time was needed for an examination of legislative and regulatory history; (4) a review of the record was required; and (5) approval of the Department of Justice was required. Recognized in the moving papers was the split in circuit court authority on the issue and the Secretary's interest in promoting uniformity. We granted the requested extension.

By letter dated May 11, 1992 from Marshall J. Breger, Solicitor of Labor, we were advised as follows:

During the time allotted by the Court, we have undertaken an extensive review of

the legal and policy issues involved in this matter. Regrettably, we have concluded that the need to fully consider all of the implications of these issues within the Department precludes our providing the Court with a brief within a foreseeable time frame. Accordingly, rather than seek a further extension, I feel constrained to decline the Court's invitation.

We do not understand why the Solicitor of Labor is unable to provide an *amicus* brief "within a foreseeable time frame" and can only deplore his failure to do so in this case. While it is not unusual for a government agency to decline an invitation to file an *amicus* brief on account of bureaucratic inertia or inability to articulate a coherent policy, *see Popkin v. Bishop*, 464 F.2d 714, 719 n. 15 (2d Cir.1972); *Securities Industry Ass'n v. Connolly*, 703 F.Supp. 146, 155 n. 16 (D.Mass.1988), *aff'd*, 883 F.2d 1114 (1st Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990), it is unconscionable for an agency to request a substantial extension of time and then fail to file the promised brief. It is especially egregious to request an extension as long as that requested here and then to advise in effect that no extension would be long enough. Courts do not have the luxury of deferring decisions indefinitely, however, and we proceed to dispose of the matter before us. We reverse in part on the fiduciary duty issue and affirm on the contract termination issue.

## BACKGROUND

As originally constituted on March 1, 1941, GAC 50 provided for the purchase of individual deferred annuities from Hancock for the Sperry Defined Benefit Retirement Plan. These annuities were purchased on an annual basis for each employee with premiums, or contributions, paid to Hancock by Sperry. They provided for regular payments to eligible Sperry employees or their beneficiaries following retirement. The premiums became part of Hancock's general account of corporate funds, and Hancock issued the guaranteed annuities at purchase rates fixed by the contract.

By amendment effective January 1, 1968, GAC 50 was converted from a deferred annuity form of contract to a Retrospective Immediate Participation Guarantee ("Retro–IPG") form of contract. The deferred annuities purchased prior to January 1, 1968 were technically cancelled and the assets supporting them placed in a Pension Administration Fund ("PAF"). However, the cancellation of the pre–1968 annuities did not affect the guarantees of benefits by Hancock to the participants and beneficiaries. With respect to the Retro–IPG, net investment income was directly credited to the PAF on an annual basis. The amount credited depended upon Hancock's general account investment performance and the allocation of that performance to the PAF. Under the 1968 amendment, Hancock guaranteed that once an employee's retirement annuity has been established, Hancock is obligated to make all future payments due under the annuity. Hancock also guaranteed that the PAF on any date would not be less than it otherwise would have been if the sum of the net interest earned and capital gains and losses apportioned to the PAF had always been zero from January 1, 1968. (Hancock in effect guaranteed that the PAF would never fall below its January 1, 1968 level.) As in the case of the deferred annuity form of contract, the premiums paid under the Retro–IPG contract became part of Hancock's general corporate funds.

The 1968 amendment required that the PAF be maintained at a level sufficient to meet the Liabilities of the Fund ("LOF") as computed by Hancock. LOF is the contractual reserve for the possible future purchase of annuities for the benefit obligations guaranteed by Hancock. The specific requirement was that the PAF balance be maintained at a level at least 105 per cent of LOF. The amount in the PAF in excess of this minimum operating level ("MOL") has been referred to by the parties as "free funds." If Sperry failed to maintain Fund balances at or above MOL, termination of the PAF would be triggered. Upon termination, the contract would cease to function in the manner of a Retro–IPG, the cancelled pre–1968 annuities would be

"repurchased" and the contract would function thereafter in the manner of a deferred annuity contract. For more than 20 years, the PAF balance in GAC 50 has exceeded its MOL. The 1968 amendment also established a method for the provision of additional benefits for the period after December 31, 1967: upon the retirement of an eligible employee, Hancock would determine the amount by which the LOF would increase if the portion of the retirement benefit in the period after January 1, 1968 were to be "guaranteed" by Hancock. If GAC 50's PAF balance exceeded the contractual MOL based upon the increased LOF, Hancock would guarantee the payment of the additional benefits.

On August 1, 1977, GAC 50 again was amended. This amendment involved its conversion to a Retrospective Immediate Participation Guarantee/Prospective Deferred Liability ("Retro–IPG–PDL") form of contract. Under the amendment, the LOF would not automatically be increased upon the retirement of any employee, and new retirement benefits would not be guaranteed by Hancock. The Sperry retirement committee could request that Hancock establish guaranteed benefits in addition to those already guaranteed, but did not do so. Sperry was entitled to designate employees eligible for non-guaranteed benefits and did designate employees to receive such benefits from the free funds in the PAF. Hancock paid such benefits on a monthly basis through June of 1982, when it gave notice as provided in the contract that it would no longer pay non-guaranteed benefits under the Retro–IPG–PDL.

Contending that Hancock's elimination of the non-guaranteed benefit payments and its elimination of the "rollover" procedure (under which withdrawals of excess funds from the PAF were allowed on two occasions) left it with no means of withdrawing any of the increasing free funds without terminating the contract and causing the purchase of annuities at inflated prices, Harris Trust commenced this action on July 20, 1983. It was the Trustee's position that Hancock employed an artificially low interest assumption to calculate the LOF, resulting in: the setting of LOF at a level much higher than necessary to provide the benefits guaranteed under the contract, oversecuring Hancock and preventing termination; and a geometrically increasing level of free funds in the PAF.

Because it allegedly was denied access to the accumulating free funds over a substantial period of time, and because Hancock was said to have administered GAC 50 improperly, Harris Trust sought in the amended complaint in this action to recover the non-guaranteed benefits withheld by Hancock, the losses resulting from Hancock's breach of duties, the profits made by Hancock using Sperry funds, and damages in an amount to be determined at trial. The complaint also sought the removal of Hancock as fiduciary, judgment enjoining Hancock from further violations of its duties, and other relief. Hancock pleaded counterclaims against Harris Trust and interposed a third-party complaint against Sperry, demanding judgment over in the event that it was found liable to Harris Trust for the breach of any common law or fiduciary duty. As previously described, the district court granted summary judgment in *Harris I* dismissing the ERISA fiduciary claims and in *Harris II* dismissing the contractual and other common law claims. The counterclaims and third-party complaint thereafter were dismissed as moot.

## DISCUSSION

### I. ERISA Fiduciary Status

(a) *As to Assets in General Account*

Harris Trust claims that Hancock bears fiduciary responsibilities to the Plan and its participants as to the free funds in the PAF under the provisions of ERISA. As defined in ERISA, one is

a fiduciary with respect to a plan to the extent ... he exercises any discretionary authority or discretionary control respecting management ... or disposition of its assets ...

29 U.S.C. § 1002(21)(A). An insurance company holding a certain type of pension fund asset in its general account escapes the definition and the concomitant duties of

a fiduciary in accordance with the following provision:

> In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer.

29 U.S.C. § 1101(b)(2). A guaranteed benefit policy is

> an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer.

29 U.S.C. § 1101(b)(2)(B).

■ It seems clear that, at least to the extent it provides for benefits guaranteed by Hancock, GAC 50 is a guaranteed benefit policy and Hancock does not act as a fiduciary in administering it. The question is: Do the free funds, as to which no guarantees are available, affect the status of GAC 50 as a guaranteed benefit policy excepted from the definition of plan assets? The district court answered that question in the negative:

> Each time ERISA uses the word 'benefit,' it refers to the payments made to the employees themselves. *See, e.g.,* 29 U.S.C. § 1002(7) (' "participant" means any employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan'); *id.* § 1002(8) (' "beneficiary" means a person designated by a participant ... who is or may become entitled to a benefit'); *id.* §§ 1023(e), 1054, 1056, 1104(a)(1)(A)(i), 1108(c)(1). The word 'benefit' in the guaranteed benefit policy exception ... refer[s] to benefits and payments to covered employees. Because GAC 50 provides for fixed payments to covered employees, it is covered by the guaranteed benefit policy exception.

*Harris I,* 722 F.Supp. at 1017–18.

We think that the district court erred in concluding that GAC 50 in its entirety is covered by the guaranteed benefit policy exception. In the plain language of the statute, a contract is a guaranteed benefit policy only "to the extent that" it provides

for benefits that an insurer guarantees. Although Hancock provides guarantees with respect to one portion of the benefits derived from the contract, it does not do so at all times with respect to all the benefits derived from the other, or free funds, portion. The non-guaranteed portion is dependent upon the insurer's investment experience and therefore is variable with respect to the benefits it provides. Legislative history supports the view that the free funds held in the GAC 50 PAF are plan assets and not included within the guaranteed policy exception:

> If the policy guarantees basic payments but other payments may vary with, e.g., investment performance, then the variable part of the policy and assets attributable thereto are not to be considered as guaranteed, and are to be considered as plan assets subject to the fiduciary rules.

H.R.Rep. No. 93–1280, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5077 ("Conference Report").

When confronted with a situation similar to the one before us, the Seventh Circuit recognized that group annuity contracts such as GAC 50 can be analyzed in terms of their guaranteed and non-guaranteed elements. The Seventh Circuit held in *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.,* 698 F.2d 320 (7th Cir.1983) that the contract in that case was not a guaranteed benefit policy in its variable accumulation phase because the amount of funds available to the pension plan was determined by the manner in which the insurer exercised its investment discretion:

> The pension trustees did not buy an insurance contract with a fixed payout; they turned over the assets of the pension plan to [the insurance company] to manage with full investment discretion, subject only to a modest income guaranty. If the pension plan had hired an investment advisor and given him authority to buy and sell securities at his discretion for the plan's account, the advisor would be a fiduciary within the meaning of the act, and that is essentially what

the trustees did during the accumulation phase of the contract. . . .

*Id.* at 327.

Similarly, in the case before us the insurer has maintained funds that were not converted to fixed, guaranteed obligations but instead were subject to fluctuation based on the insurer's investment performance. But the statute defining "guaranteed benefit policy," as noted previously, refers only to that phase of the contract in which the insurer is obligated to guarantee fixed benefits to plan participants. To the extent that the insurer engages in the discretionary management of assets attributable to that phase of the contract which provides no guarantee of benefit payments or fixed rates of return, it seems to us that the insurer should be subject to fiduciary responsibility. *See* 29 U.S.C. § 1002(21)(A).

The district court of course disagreed with the reasoning of *Peoria Union,* holding that retirement plan assets such as GAC 50 do not include funds held in an insurer's general account. In support of its conclusion, the district court reasoned that the

> amount provided to the covered employees remains fixed even if the PAF falls below the minimum operating level and the contract reverts to a deferred annuity type. . . . [I]f Hancock's general account experiences negative investment results, it must still pay the covered employees the amounts to which they are entitled. . . . Hancock could request additional contributions from Harris Trust, but Harris Trust would be free to decline. GAC 50 would then revert to deferred annuity form, and Hancock would be obliged to provide annuities to all covered employees in consideration of the benefits guaranteed to those employees up to that time.

*Harris I,* 722 F.Supp. at 1016–17.

The flaw in this reasoning lies in the fact that at certain times, until there is a conversion to guaranteed benefits, Hancock is managing assets taken in under GAC 50 as to which there are no guarantees. The fact that all the assets of GAC 50 are held in Hancock's general account is not signifi-

cant in view of Hancock's discretionary authority over the non-guaranteed phase of the contract. In *Mack Boring and Parts v. Meeker Sharkey Moffitt,* 930 F.2d 267 (3d Cir.1991), the Third Circuit adopted the district court's approach in a case involving a contract with attributes similar to those of GAC 50. The Third Circuit held that the contract was, in its entirety, a guaranteed benefit policy because it was a "general account insurance contract in which the issuing insurance company guarantees to the plan participants a fixed amount of benefits, payable at a clearly stated time." *Id.* at 277. It was sufficient for the *Mack Boring* court that the contract made provision for "guaranteed benefits to plan participants at some finite point in the future." *Id.* at 273. That court in effect extended the statutory exemption to the entirety of any contract under which any benefits are guaranteed, so that the exemption would apply regardless of the apportionment between the guaranteed component and the investment component of the contract.

Two Advisory Opinions issued by the Department of Labor lend support to the notion that the free funds in GAC 50 are plan assets as to which Hancock is an ERISA fiduciary. In the first, reference is made to

> a Congressional intent that when an insurance company provides investment advice which determines the rate of return to the plan and its participants, the assets in the account shall constitute plan assets so that the insurance company is subject to the fiduciary responsibility provisions of the Act.

DOL Advisory Opinion 78–8A (March 13, 1978). As to at least one component of GAC 50, Hancock's investment performance clearly does affect the amount of funds available to the plan and its participants.

According to the second DOL Advisory Opinion,

> a conventional separate account (which holds contributions received from a plan and provides for the crediting of income on such amounts based upon the investment experience of the separate account)

would not be considered to be maintained in connection with a fixed contractual obligation of the insurance company merely because assets of the separate account are ultimately applied to provide fixed annuities to participants, and the assets of such a separate account would be considered to be plan assets.

DOL Advisory Opinion 83–51A (September 21, 1983). The Department of Labor in the second opinion thus appears to take the position that "plan assets" for the purpose of the fiduciary responsibility provisions of ERISA do not lose their status as such merely because the ultimate use of the account may be to provide fixed annuities, where the plan assets are affected by investment performance.

Both advisory opinions were preceded by a seemingly contradictory Department of Labor pronouncement, Interpretive Bulletin 75–2:

> If an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets in such account shall not be considered to be plan assets. Therefore, a subsequent transaction involving the general asset account between a party in interest and the insurance company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction.

This Interpretive Bulletin was confirmed in a regulation adopted November 13, 1986. *See* 29 C.F.R. § 2509.75–2 entitled "Interpretive bulletin relating to prohibited transactions." Despite the confusion, it seems to us that the Interpretive Bulletin was designed to deal with prohibited transactions in regard to conflict of interest situations. Indeed, the preamble to the regulation recites that IB 75–2 was issued

> with respect to whether a party in interest has engaged in a prohibited transaction with ... a corporation or partnership ... in which the plan has invested.

There is no inconsistency in considering certain assets to be plan assets for general fiduciary duty purposes but not for prohib-

ited transaction purposes. *See Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 729 F.Supp. 1162, 1184–85 (N.D.Ill.1989), *aff'd*, 941 F.2d 561 (7th Cir. 1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992).

### (b) *As to the GAC 50 Contract*

■ We agree with the district court that the contract itself, GAC 50, is not a plan asset as to which Hancock has a fiduciary responsibility. According to the statute, the assets of a plan to which an insurer issues a guaranteed benefit policy "shall be deemed to include such policy." 29 U.S.C. § 1101(b)(2). The policy itself, with its bundle of contractual rights and responsibilities, therefore is similar to any other financial instrument owned by an employee benefit plan. Hancock is not a fiduciary in regard to the policy here, however, because it does not "exercise[ ] any discretionary authority or discretionary control ... respecting management or disposition of" the policy itself. 29 U.S.C. § 1002(21)(A). Only Harris Trust as contractholder has discretionary authority over the guaranteed benefit policy *qua* policy.

The view that the holder of the contract is the entity subject to fiduciary responsibility is supported by legislative history:

> A trust is not to be required in the case of plan assets which consist of insurance (including annuity) contracts or policies issued by an insurance company qualified to do business in a State (or the District of Columbia) .... Although these contracts need not be held in trust, nevertheless, the person who holds the contract is to be a fiduciary and is to act in accordance with the fiduciary rules ... with respect to these contracts.

Conference Report, *supra*, at 5079.

Obviously, Hancock has no power unilaterally to alter or amend a contract to which it is a party. It can act only under the terms of the policy, and any change in the policy requires the consent of the contractholder. We here deal with the policy in its entirety, and any power that Hancock had was referable to the terms of that policy. While Hancock may act as a fiduciary in

carrying out certain of its contractual duties under the policy as previously described, it has no fiduciary responsibility in regard to the undivided contract. Neither of the cases that Harris Trust relies upon to support the argument that Hancock will be held to fiduciary standards with respect to the contract itself is apposite. In both *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737–38 (7th Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987), and *Chicago Bd. Options Exchange, Inc. v. Connecticut General Life Ins. Co.*, 713 F.2d 254 (7th Cir.1983), the insurer had and exercised a unilateral right to alter in its discretion a critical contract term, resulting in prejudice to the contractholder. Such was not the case here, where Hancock at all times exercised its express rights under the contract. Fiduciary duties were implicated only when Hancock became involved in the administration or management of plan assets not referable to guaranteed benefits. *See Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1416–17 (2d Cir.1985); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1159–60 (3d Cir.1990).

### (c) As Affected By Prior Litigation

■ In *Jacobson v. John Hancock Mutual Life Ins. Co.*, 655 F.Supp. 1290, *withdrawn pursuant to settlement*, 662 F.Supp. 1103 (D.Conn.1987), the plaintiff pension plan trustees asserted that Hancock was a fiduciary with respect to a Retro–IPG contract, similar to GAC 50, and the funds held under the contract. The *Jacobson* court granted partial summary judgment, holding that funds received by Hancock, not converted to fixed guaranteed obligations but held subject to fluctuations based on investment performance, were "plan assets" for which the insurer was accountable as an ERISA fiduciary. Hancock thereafter settled with the trustees, and the opinion was withdrawn pursuant to the settlement. Harris Trust argues that Hancock is estopped from relitigating the issue of its status as an ERISA fiduciary by the vacated district court order.

The district court properly rejected the argument of Harris Trust that Hancock is

collaterally estopped from relitigating its fiduciary status as to Retro–IPG contracts by virtue of the district court's decision in *Jacobson*. The order entered on the stipulation of the parties in that case included the following language:

> ORDERED, that the Order, together with the findings and conclusions embodied therein, is withdrawn, set aside and vacated, and shall be of no force or effect for use against defendant, its successors and assigns, by plaintiffs, by the Pension Fund or by third parties, for collateral estoppel or other preclusive purposes....

*Jacobson*, 662 F.Supp. at 1113. It is well-settled in this circuit that a vacated order has no collateral estoppel effect. *See Corporation of Lloyd's v. Lloyd's U.S.*, 831 F.2d 33, 36 (2d Cir.1987); *Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 919–20 (S.D.N.Y.1983), *aff'd*, 746 F.2d 112 (2d Cir.1984). We have held that it is an abuse of discretion for a district court to refuse to enter a vacatur pursuant to a settlement providing that the vacated order would not have collateral estoppel effect in any subsequent action. *Nestle Co. v. Chester's Mkt., Inc.*, 756 F.2d 280, 282 (2d Cir. 1985). We recognized in *Nestle* "the importance of honoring settlements over the finality of trial court judgments." *Id.* at 283. The district court correctly refused to estop Hancock from litigating its fiduciary status on the basis of *Jacobson*.

## II. Contract Termination

■ Harris Trust contends that Hancock breached GAC 50 by terminating non-guaranteed benefit payments. We reject that contention and agree with the district court that Hancock properly terminated these benefits on 31 days notice. Hancock properly relied upon the following contractual provision as conferring the right to terminate:

Section 9. Payment of Non-guaranteed Benefits.

Non-guaranteed Benefit payments shall be payable to a payee, provided the Pension Administration Fund is sufficient for the purpose, upon written notice

from the [employer] to the [insurer]....
Non-guaranteed Benefit payments shall continue until

\* \* \* \* \* \*

(c) the date as of which the [insurer], by written notice filed with the Retirement Committee at least thirty-one days prior thereto, declares its intention to cease such payments.

GAC 50, 1977 Amendment, Article 4, Section 9.

It is the position of Harris Trust that Hancock has the right to terminate non-guaranteed benefit payments only if the PAF is insufficient to allow for such payments. That position is predicated principally on two provisions in the contract:

On and after the Benefit Commencement Date of an employee, the Non-guaranteed Benefit for such an employee or his designated survivor shall be payable hereunder in accordance with the Plan until the earliest of the date of his death, the date the Retirement Committee notifies the Company in accordance with Section 9 of Article IV that said Non-guaranteed Benefit payments are to be cancelled, suspended or adjusted, or the date the Pension Administration Fund is not sufficient to provide the Non-guaranteed Benefits for the payee.

GAC 50, 1977 Amendment, Article II, Section 3.

On the Benefit Commencement Date of an employee and on each date thereafter on which a Non-guaranteed Benefit is due with respect to an employee on or before the date of termination of the Fund, a Non-guaranteed Benefit shall be provided hereunder with respect to each employee entitled thereto. The Company shall be liable for any amount of Non-guaranteed Benefit expressed to be payable only to the extent to which the Fund is sufficient to provide such amount.

GAC 50, 1977 Amendment, Article III, Section 2(b).

Contrary to the reading of Harris Trust, the contract does not prohibit termination before the PAF becomes insufficient. The Article III provision is entitled "Contributions" and in the main deals with the methods of contributions to the plan. The quoted language makes the unexceptional statement that non-guaranteed benefits are available only to the extent permitted by the PAF. The Article II provision is entitled "Dates of Coverage and Plan of Benefits" and deals specifically with those matters covered by that title. To say as that provision does that non-guaranteed benefits shall be payable until the date of death, notification by the Retirement Committee or the date the PAF is insufficient is not to gainsay the later provision of Article IV for termination on the basis of another contingency, i.e., thirty-one days notice. It is significant that Article IV follows the provisions upon which Harris Trust relies and, as amended, is entitled "Provisions Pertaining to the Payment of Benefits." It also is significant that Section 9 of Article IV is entitled "Payment of Non–Guaranteed Benefits," repeats the grounds for termination previously recited and adds one besides— termination on notice. Important, if not controlling for our purposes, is the fact that all the grounds for termination provided in Section 9 are accorded equal dignity by being listed separately.

Although the district court took some testimony pursuant to Fed.R.Civ.P. 43(e) to determine whether there was an issue of fact in connection with the motion for summary judgment, it ultimately determined that

the alleged conflict in language between Article IV, Section 9, and Article II, Section 3, relied on by plaintiff is resolved by the underlying structure of the contract itself, as to which there is no genuine issue of material fact.... Accordingly, Hancock's termination of non-guaranteed benefits in 1982 did not constitute a breach of contract.

*Harris II*, 767 F.Supp. at 1278. We endorse the conclusion of the district court. Where the language of a contract is clear, summary judgment is appropriate, and the fact that one party may have a different interpretation of the language does not make it any less plain. *See Investors Ins. Co. v. Dorinco Reins. Co.*, 917 F.2d 100, 104 (2d Cir.1990). The proper interpreta-

tion of a contract is a question of law for the court. *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989). Extrinsic evidence is unnecessary where it is determined that the contractual language is unambiguous. *See Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231, 233 (1986). The district court properly limited itself to the unambiguous contractual language in resolving the issue of termination in this case.

## CONCLUSION

The judgment of the district court is reversed to the extent that it determined that Hancock had no fiduciary duty with regard to the excess funds allocated to the payment of non-guaranteed benefits and affirmed in all other respects. The case is remanded for further proceedings consistent herewith.